939 So.2d 1182 (2006)
JOSHUA WEBB, Appellant,
v.
FLORIDA DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Appellee.
No. 4D05-1409.
District Court of Appeal of Florida, Fourth District.
October 25, 2006.
Howard M. Talenfeld and Tracey K. McPharlin of Colodny, Fass, Talenfeld, Karlinsky & Abate, P.A., Fort Lauderdale, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Charles M. Fahlbusch, Senior Assistant Attorney General, Fort Lauderdale, for appellee.
WARNER, J.
Joshua Webb appeals an order of an administrative hearing officer denying his application for Medicaid Waiver Services through the Agency of Persons with Disabilities program (APD). Webb claims that the officer erred in determining that he was not retarded, because the officer relied solely upon one full scale IQ test, without consideration of Webb's other test scores. We conclude that the officer applied a standard for eligibility contrary to the applicable statute and to the agency's published interpretations. We therefore reverse.
Joshua Webb, born in 1987, has been in foster care since the age of nine after having been removed from his mother's home and declared a dependent. He has a troubled past, including a history of left brain injury, emotional dysfunction, depression, and behavioral problems, and a long juvenile arrest record. After being placed in state care, his behavior seemed to improve somewhat, but he continued to have other problems.
Four neuropsychological evaluations have been performed on him. In 1997, when he first entered DCF care at age ten, psychologists from Nova Southeastern University performed an evaluation, testing him using the Wechsler Intelligence Scale for Children. Webb received a verbal IQ score of 66, a performance IQ score of 81, and a full scale IQ score of 71. (The full scale IQ is a mathematically derived combination of the other individual scores.) In 2003, the Dependency Court judge ordered another test, also performed by Nova. This time Webb's scores revealed a verbal IQ of 66, a performance IQ of 75, and a full scale IQ of 69. A third evaluation of Webb took place in August 2004 at the request of the Agency when Webb sought a waiver to obtain community services. This testing was performed by Dr. Janice Wilmoth, using the Wechsler Adult Intelligence Scale. Webb obtained the following scores: a verbal IQ of 77, a performance IQ of 91, and a full scale IQ of 82. Dr. Wilmoth concluded that Webb "no longer meets the standards to be deemed mildly mentally retarded." A final evaluation was performed by Dr. Appel who had been appointed by the Dependency Court to make a second evaluation of whether Webb was mentally retarded and met the waiver requirements. She used the Weschler Intelligence Scale for Children, and Webb scored a verbal IQ of 66, a performance IQ of 81, and a full scale IQ of 71.
The Agency denied Webb's request for a waiver, based upon Dr. Wilmoth's testing results. Webb requested a hearing before an administrative hearing officer. The issue for the hearing officer to determine was whether Webb was developmentally disabled within the meaning of the Agency for Persons With Disabilities program.
At the hearing, Brian Moore, the APD counselor who determined Webb's eligibility for the program, testified that he relied on the Support Coordination Guide Book in determining Webb's eligibility. The Guide Book provides that "no single score or combination of scores, tests or procedures is to be used as the sole criterion for determining eligibility." Additionally, the Guide Book provides, in pertinent part:
Any I.Q. score that is three to five points below or above 70 is to be accompanied by an interpretation of the following criteria: . . . 2. The district developmental services program has the authority to determine eligibility without additional testing if the applicant's history indicates:
a. the applicant is or has received special education classes designed to address the needs of people who have a diagnosis of mental retardation or
b. the applicant's educational records indicate that the person tested in the range of mental retardation, both intellectually and adaptively, prior to the age [of] 18 and there is no documentation that conditions other than mental retardation are responsible for the class placement or depressed scores.
Despite the Guide Book's direction to look at all the scores, Moore testified that he was instructed by the Department psychologists to use the full scale IQ scores. As a result, Moore himself placed more emphasis on the full scale than the other scores. Because Moore considered Webb's history to be close on whether he qualified for the waiver without further testing, the counselor ordered the testing which was performed by Dr. Wilmoth. After receiving those scores, he denied the application based upon Dr. Wilmoth's conclusion that Webb was not mentally retarded.
In Dr. Wilmoth's testimony at the hearing, she stood by her testing and rejected the suggestion that Webb's scores were inflated due to the "practice effect" of Webb having taken other intelligence tests. She extensively interviewed Webb regarding his prior history in addition to the testing that she performed. She used the full scale score as a portion of her analysis, combined with scales of adaptive functioning, designed to measure his ability to perform basic tasks of living. Based upon her testing, she determined that he did not meet the criteria for mental retardation. She used the Florida statutory definition of retardation, which requires test scores that are two or more standard deviations below the mean on a standardized intelligence test. She did not use a single score but relied on the full scale score combined with the adaptive functioning test. She opined that Webb's lack of functional skills were the result of an emotional disturbance, not mental retardation.
Dr. Appel strenuously disagreed with a determination that Webb was not mentally retarded. She looked to Webb's verbal IQ score of 66 when he was ten as well as his scores in 2003 and explained that under federal Social Security regulations, if any of the three scores on a standardized IQ test fall below 70, the individual qualifies as being mentally retarded. She also reviewed the 2003 tests, conducted her own tests, and concluded that at least one score from all of the tests other than Dr. Wilmoth's would qualify Webb as being mentally retarded. She attributed Dr. Wilmoth's scores to the "practice effect" and concluded that Dr. Wilmoth's testing was "totally inconsistent" with the other testing done on Webb.
The hearing officer issued an opinion in which he "considered" the evidence of both Dr. Wilmoth and Dr. Appel, including the "practice effect" argument along with all of the other arguments. He quoted from the statutory definitions and made the following conclusions:
In this case, the petitioner has the burden of proof as an applicant to show that he qualifies for the program, as explained in the Florida Administrative Code at 65-2.060. It is determined that this burden has not been met. According to the cited Statute, retardation means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. Also included in the definition is significantly subaverage general intellectual functioning with a performance that is two or more standard deviations from the mean score on a standardized intelligence tests.
The petitioner obtained a Full Scale I.Q. score of 82, prior to his eighteenth birthday. This indicates that he is functioning within the low ranges of below average intelligence, however he is not significantly subaverage in general intellectual functioning, with a performance which is two or more standard deviations from the mean score on a standardized intelligence test. After careful consideration, it is determined that the action of denying the application for the Agency For Persons With Disabilities Program (APD) Home and Community Based Medicaid Waiver Services, because the petitioner's test scores do not place him in the mentally retarded ranges, is upheld.
From this order, Webb appeals, contending that the hearing officer applied an incorrect standard in evaluating the evidence.
When an agency determines an applicant is ineligible for services, the applicant has the right to a "fair hearing" under the provisions of Florida Administrative Code Rule 65-2.042, et seq. Pursuant to rule 65-2.056(3), "[t]he Hearing Officer shall determine whether the action taken by the Agency was correct at the time the action was taken." The burden of proof is on the applicant in cases where the Department denies an application. Fla. Admin. Code R. 65-2.060.
We apply a deferential standard of review to factual conclusions of a hearing officer in disability cases but not to conclusions of law, including the proper standards to apply to the disability determination. See Axilrod v. Dep't of Children & Family Servs., 799 So. 2d 1103 (Fla. 4th DCA 2001).
Webb maintains that both the agency and the hearing officer erred in determining that Webb was not mentally retarded by relying exclusively upon one full scale IQ score which did not fall below two standard deviations from the mean test score on a standardized intelligence test. Webb points out that he had multiple other tests which met that standard and argues that reliance on the full scale score only is precluded by section 393.063(38), Florida Statutes (2004).[1] He considers the hearing officer's reference to the full scale IQ score as setting the legal standard upon which he determined the issue.
Pursuant to the Home and Community Based Services Waiver Act, Title XIX of the Social Security Act, 42 U.S.C. § 1396n(c), Congress has authorized certain persons with developmental disabilities to receive Medicaid services in a community setting. This Act enables the Secretary of Health and Human Services to grant a waiver to a state under which approved costs of home and community-based services are reimbursed for eligible individuals who elect to remain in their homes, but who otherwise would require care in an institutional facility. See 42 U.S.C. § 1396n(c); Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1268 (11th Cir. 2000).
Florida has elected to participate in the Home and Community Based Waiver Program. See Fla. Admin. Code R. 59G-13.080. To be eligible for the waiver program, an applicant must have a developmental disability as defined in Chapter 393, Florida Statutes. See Developmental Services Waiver Services Florida Medicaid Coverage and Limitations Handbook, p. 2-2; Fla. Admin Code R. 59G-13.080(12) (incorporating the handbook by reference).
The hearing officer was charged with determining whether the agency's action in denying the benefits was correct when taken  that is, whether Webb was disabled within the statutory definition. A "developmental disability" is defined as "a disorder or syndrome that is attributable to retardation, cerebral palsy, autism, spina bifida, or Prader-Willi syndrome and that constitutes a substantial handicap that can reasonably be expected to continue indefinitely." § 393.063(10), Fla. Stat. (2004). The term "retardation" means "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." § 393.063(38), Fla. Stat. (2004). "Significantly subaverage general intellectual functioning" is in turn defined as "performance which is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the agency." § 393.063(38), Fla. Stat. (2004). Further, "Adaptive Behavior" is defined as "the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." Id.
The agency has not adopted rules which specify the type of standardized intelligence test to utilize in determining "significantly subaverage general intellectual functioning." Further, there are no rules with respect to the interpretation of intelligence tests for purposes of determining retardation, nor are there any other rules which govern the determination of retardation. Therefore, the statute alone determines the legal standard to apply. Thus, the criteria for determining developmental disability are: 1) a disorder or syndrome; 2) attributable to retardation; 3) constituting a substantial handicap; 4) which can reasonably be expected to continue indefinitely. The criteria for determining retardation are: 1) performance which is two or more standard deviations from the mean score on a standardized intelligence test; 2) existing concurrently with deficits in adaptive behavior; and 3) manifested before age 18.
The hearing officer failed to correctly apply the legal test of the statute. The criteria for determining retardation required only that the applicant obtain a qualifying score prior to his eighteenth birthday and concurrently exhibit deficits in adaptive behavior. Rather than focus on the scores which showed that Webb met this qualification, the hearing officer instead looked only to a score which did not meet the statutory definition. He thus ignored the legal standard for retardation set forth in the statute. Because he went no further than determining that Webb obtained a score which would not constitute mental retardation under the statute, he did not make any other findings which would apply the standard correctly.
Where the applicant achieves a qualifying score more than two deviations below the mean score on a standardized intelligence test prior to his eighteenth birthday, which Webb did on several other tests, then the hearing officer must determine whether, concurrently, deficits in adaptive behavior were observed, and the officer must make a finding of fact on this issue. Next, the officer must determine whether the retardation manifests itself in a disorder or syndrome which constitutes a substantial handicap. Finally, the officer must determine whether the substantial handicap can reasonably be expected to continue indefinitely.
In Webb's case, the hearing officer failed to make the necessary findings, given the legal standard set forth in the statute. The evidence was undisputed that on other tests Webb had scored in a range to meet the first criteria for retardation, and the hearing officer made no findings that the prior tests were invalid. Therefore, the hearing officer should have gone to the next criteria, namely determining whether he also exhibited deficits in adaptive behavior. The hearing officer failed to make any finding on this factor or on the remaining factors, including whether the disorder or syndrome may be reasonably expected to continue indefinitely.
It is clear that the hearing officer relied on the results of Dr. Wilmoth's tests and her opinions. Those tests and opinions offer evidence on the other criteria which also must be met, namely whether the retardation observed results in a substantial handicap which can be reasonably expected to continue indefinitely. Dr. Wilmoth attributed Webb's improved scores to a diagnosis of emotional disturbance, not retardation. With treatment his lower intelligence IQ would not continue indefinitely. Of course, there was other evidence, including the testimony of Dr. Appel, which disputed Dr. Wilmoth's observations. However, the hearing officer did not make any findings on these other factors.
We reject Webb's reliance on federal Social Security disability regulations which he claims would mandate his qualification as developmentally disabled because he scored below an IQ of 70 on one test. He suggests that the Florida Legislature, in using language identical to the definition of "mental retardation" in the Social Security regulations, necessarily intended the federal Social Security regulations to apply with respect to the interpretation of intelligence tests for purposes of determining retardation under Chapter 393 of the Florida Statutes. He simply argues that it is reasonable to assume that the Florida Legislature intended the Social Security regulations to apply because both Chapter 393 and the Social Security Administration utilize the standard definition of retardation set forth in the Diagnostic and Statistical Manual of Mental Disorders. However, Webb cites to no authority which indicates that the Florida Legislature intended regulations promulgated by the Social Security Administration to apply to Chapter 393.
Moreover, even if we were to apply the Social Security regulations in determining his eligibility for waiver services, his verbal IQ score of 66 in 1997 would not automatically qualify him for services under the disability standards in the Social Security regulations. The Social Security Administration has adopted rules regarding the interpretation of IQ tests to determine retardation for purposes of SSDI eligibility. The relevant Social Security regulation provides that, "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at § 12.00(D)(6)(c) (2006). Webb points to this language in arguing that he should be deemed eligible for waiver services as of 1997, when he received a verbal IQ score of 66.
Under provision 12.05 of the Social Security Administration's Listing of Impairments, one basis for determining that a person has the required level of severity of mental retardation is if that person has:
D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.
20 C.F.R. Pt. 404, Subpt. P, App. 1, at § 12.05. Additionally, the Social Security regulations require any mental disability determination to be made on the basis of longitudinal evidence. See 20 CFR Pt. 404, Subpt. P., App. 1 12.00(D)(2) ("Need for longitudinal evidence. Your level of functioning may vary considerably over time. The level of your functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish your impairment severity."). Even under the Social Security regulations, the results of one IQ test would not necessarily qualify a person as retarded. Therefore, even if we were to agree with Webb and apply the Social Security regulations, it is clear that additional fact-finding would be required in this case to determine if Webb had the required level of severity of mental retardation to qualify for services.
Although we reject Webb's reliance on the Social Security disability regulations, we agree that the hearing officer used an erroneous legal standard in upholding the agency's denial of his application for waiver services. Because the hearing officer did not use the correct legal standard as contained in the statute for determining whether Webb was developmentally disabled, we reverse and remand for further proceedings in accordance with this opinion.
GROSS and HAZOURI, JJ., concur.
Not final until disposition of timely filed motion for rehearing.
NOTES
[1] Due to a statutory amendment by the legislature in 2006, the definition of retardation is now set forth in section 393.063(31), Florida Statutes (2006). See Laws of Fla. Ch. 2006-227.